**ALMEIDA LAW GROUP LLC**
Victor J. Sandoval (SBN 344461)
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
t: (562) 534-5907
victor@almeidalawgroup.com

*Counsel for Plaintiffs & the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ALEXANDRA VREDENBURGH and PAUL COUTU *individually and on behalf of all others similarly situated*,

Plaintiffs,

vs.

OPENAI OPCO, LLC,

Defendant.

Case No. 3:26-cv-10527

**CLASS ACTION COMPLAINT**

1. VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *et seq.*
2. VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE §1770, *et seq.*
3. VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500 *et seq.*
4. FRAUDULENT OMISSIONS AND CONCEALMENT
5. INTRUSION UPON SECLUSION
6. INVASION OF PRIVACY
7. VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT, CAL. CIV. CODE § 1798.100, *et seq.*
8. UNJUST ENRICHMENT

**DEMAND FOR JURY TRIAL**

Plaintiffs Alexandra Vredenburgh and Paul Coutu ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this putative class action lawsuit against OpenAI OpCo, LLC ("OpenAI" or "Defendant") and allege as follows upon personal knowledge as to Plaintiffs' own acts, and upon information and good faith belief and the investigation of counsel as to all other matters:

## INTRODUCTION

1. More than 900 million people use ChatGPT. They use it to ask all manner of private, sensitive, and intimate questions, ones that they would not ask a person, whether "in real life" or online. They describe symptoms to it. They tell it about their marriages, their debts, their employers, their children, and their fears.

2. The interface OpenAI designed for them is a blank window and a blinking cursor—suggesting a one-to-one confidential exchange with a machine, conducted in what feels or is, at least, constructed to be a private setting.

3. It is not private. OpenAI retains hundreds of outside contractors—working for third-party firms—whose job is to read the conversations that ChatGPT users have with the product and to grade the product's answers.

4. OpenAI's internal codename for this project, in which it intentionally provides third parties with access to ChatGPT's users' communications, is "Project Lily."[1]

5. A reviewer is shown a real user's prompt—frequently an entire conversation—so that it may evaluate the response, and writes a paragraph explaining the score. This is *not* the human-assisted safety review OpenAI has disclosed.

6. OpenAI tells consumers that it monitors its services for content that may violate the law or its policies, and that its team "may review flagged content to determine appropriate actions."[2]

7. Project Lily is different in kind because third-party review of ChatGPT users'

---

[1] Joseph Cox, *Inside 'Project Lily': The Humans Reading Your ChatGPT Chats*, 404 Media (Sept. 14, 2026), https://www.404media.co/inside-project-lily-the-humans-reading-your-chatgpt-chats/.

[2] OpenAI, *Transparency & Content Moderation*, https://openai.com/transparency-and-content-moderation/ (July 29, 2026)

prompts is not triggered by a flag, it is not triggered by a suspected violation, it does not result in an enforcement action, and it is not performed by OpenAI's own team.

8. Rather, Project Lily sweeps in millions of conversations, routes them to strangers employed by other companies, and allows them to read them for the purpose of making OpenAI's product better. OpenAI never informed ChatGPT users that their private, intimate, conversations would be read by humans tasked with improving their models.

9. OpenAI has told consumers—repeatedly, and in the documents that purport to govern their relationship with consumers—what happens to their conversations. The account it gave describes a closed loop between a consumer and a machine.

10. For instance, OpenAI's Privacy Policy devotes a section to "Disclosure of Personal Data," in which it enumerates, by category, the outside entities that receive consumers' Personal Data: providers of hosting services, customer service vendors, cloud services, content delivery services, support and safety services, email communication software, web analytics services, payment and transaction processors, search and shopping providers, information technology providers, and age- and identity-verification providers.[3]

11. No category is a data-annotation, data-labeling, human-evaluation, or model-training vendor. A consumer who read it would learn that her Personal Data reaches the companies that keep ChatGPT running, bill her, and secure the platform. She would not learn that it reaches a company whose workers are paid to read it to improve OpenAI's model.

12. Its Privacy Policy also defines "Content" as the Personal Data that users input into its services, "including your prompts and other content you upload," and tells consumers that OpenAI "may use Content you provide us to improve our Services, for example to train the models that power ChatGPT" and provides a link to a page entitled "How your data is used to improve model performance."[4]

13. That page contains a section captioned "What the [training] process looks like." In its entirety, that section tells the consumer that OpenAI retains certain data from user interactions,

---

[3] OpenAI, *Privacy Policy* (Sept. 10, 2026), https://openai.com/policies/privacy-policy/.

[4] *Privacy Policy*, *supra* note 3.

that it "take[s] steps to reduce the amount of personal information in our training datasets before they are used to improve and train our models," and that this data "helps us better understand user needs and preferences, allowing our model to become more efficient over time."[5]

14. In other words, OpenAI's answer to the question, "what happens to my conversation?" describes retention, redaction, and machine learning but—rather remarkably—it does not disclose human review (and certainly not by third party contractors).

15. To be sure, OpenAI knows how to disclose that a human being may read a consumer's ChatGPT conversations, because it does so where it has elected to.

16. Its Terms of Use expressly warn consumers whose accounts are transferred to an organizational account that the organization's administrator "will be able to control your account, including being able to access Content."[6]

17. Its Privacy Policy repeats the warning, telling consumers that business-account administrators "may access and control your OpenAI account, including being able to access your Content."[7]

18. OpenAI likewise discloses that human reviewers may read conversations for safety and abuse-monitoring purposes.[8]

19. Thus, when another category of human being could read a consumer's conversations, OpenAI readily disclosed that in plain language, in the operative documents.

20. But it made no such disclosure regarding Project Lily's use of third-party human reviewers to examine confidential prompts and other content.

21. That asymmetry establishes that OpenAI understood human access to Content to be a fact consumers would want to know, and disclosed it in every context except the one at issue here.

22. A consumer who types a prompt into ChatGPT understands that a computer system

---

[5] OpenAI, *How Your Data Is Used to Improve Model Performance* (Mar. 13, 2026), https://openai.com/policies/how-your-data-is-used-to-improve-model-performance/

[6] OpenAI, *Terms of Use*, https://openai.com/policies/terms-of-use/ (January 1, 2026).

[7] *Privacy Policy*, *supra* note 3.

[8] *Content Moderation*, *supra* note 2.

will process the information she provides. It does not follow—and OpenAI's disclosures did nothing to convey—that a person employed by an unrelated company will later sit at a workstation, read the substance of what she wrote, and write a critique.

23. That difference is significant, and OpenAI's conduct demonstrates that it knows the difference is material. For example, it explicitly disclosed human review for safety purposes and expressly disclosed human access by enterprise administrators.

24. And when a reporter asked OpenAI to identify where it had told users that humans may read their prompts in order to improve ChatGPT's responses, "OpenAI did not answer the question."[9]

25. OpenAI's own contractor instructions direct reviewers to escalate tasks containing personal information—an implicit acknowledgment that personal information reaches them.[10] OpenAI further acknowledges that the automated filter applied before conversations reach reviewers can fail.[11] And the reviewer's screen may display a summary of what the consumer has previously used ChatGPT for, including, for example, her name and where she lives.[12]

26. What reviewers read is not anodyne. Consumers tell ChatGPT about their health, their finances, their sex lives, their mental health, and the private affairs of their families. Some of them, in the very prompts reviewers read, ask ChatGPT to keep what they have said in confidence.

27. California's privacy regulations direct that the purposes for which personal information is processed must be consistent with consumers' reasonable expectations, and that those expectations are measured by, among other things, "[t]he specificity, explicitness,

---

[9] *Cox*, *supra* note 1. Only after the article published did OpenAI identify a disclosure—the buried Help Center FAQ described below. A disclosure that the disclosing party cannot find on request is not one a consumer can be expected to find unprompted.

[10] *Cox*, *supra* note 1

[11] *Introducing OpenAI Privacy Filter*, OpenAI (Apr. 22, 2026), https://openai.com/index/introducing-openai-privacy-filter/ ("Privacy Filter can make mistakes. It can miss uncommon identifiers or ambiguous private references, and it can over- or under-redact entities when context is limited, especially in short sequences."); *see* Cox, *supra* note 1 (OpenAI stating that it processes users' conversations through a version of Privacy Filter before they reach contractors).

[12] *Cox*, *supra* note 1

prominence, and clarity of disclosures" and "[t]he degree to which the involvement of service providers, contractors, third parties, or other entities in the collecting or processing of personal information is apparent to the consumer(s)." 11 C.C.R. § 7002(b)(4)-(5).

28. OpenAI's disclosures fail as to both. They are not specific, explicit, prominent, or clear as to human review. A reasonable consumer reading these documents and following the links OpenAI incorporates into those documents, is left with the reasonable impression that machines process her conversation and is never told that a person reads it.

29. And the involvement of third party human reviewers for model training purposes is affirmatively obscured. OpenAI enumerated eleven categories of outside entity that receive consumers' Personal Data, none of which is a data-annotation, data-labeling, human-evaluation, or model-training vendor. A consumer who consulted the one section of the Privacy Policy addressed to exactly this question would come away understanding that her conversations are shared with the vendors who host, bill, secure, and support the platform—not those tasked with reviewing her conversations for model training purposes.

30. Class members who paid for ChatGPT subscriptions paid a price premium for a service whose privacy characteristics were materially misdescribed, and would not have purchased, or would have paid less, had the truth been disclosed.

31. Class members were deprived of the ability to make an informed decision about what to say to ChatGPT, and had the substance of their private communications conveyed to and read by strangers.

32. OpenAI took, without disclosure and without compensation, an input of substantial and ascertainable commercial value—prompts and human-gradable conversational data, among the scarcest and most expensive raw materials in the generative artificial intelligence industry.

33. Accordingly, Plaintiffs bring this action on behalf of themselves and all similarly situated consumers for restitution, damages, and injunctive relief, including public injunctive relief requiring, *inter alia*, OpenAI to disclose—on its chat interface and in the documents consumers actually receive—that their conversations may be read by third-party human reviewers for model training and improvement purposes; to make human review a matter of affirmative consent rather

than a default; and to stop deploying and destroy models built from conversations it obtained without telling consumers the truth.

## PARTIES

34. Alexandra Vredenburgh ("Vredenburgh") is and was at all relevant times, an individual and resident of Carlsbad, California. She intends to remain in California indefinitely and makes her permanent home there.

35. Paul Coutu ("Coutu") is and was at all relevant times, an individual and resident of the City of San Francisco in San Francisco County, California. He intends to remain in California indefinitely and makes his permanent home there.

36. OpenAI OpCo, LLC is a Delaware limited liability company with its principal place of business at 1455 Third Street, San Francisco, California 94158. OpenAI develops, operates, markets, and sells access to ChatGPT, and authored and published each of the consumer-facing disclosures at issue in this action.

## JURISDICTION AND VENUE

37. The exercise of federal subject matter jurisdiction is appropriate pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"), because (i) at least one member of the Class is a citizen of a different state than Defendant, (ii) there are more than 100 members of the Class, (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iv) none of the exceptions apply to this action.

38. This Court has personal jurisdiction over OpenAI. OpenAI maintains its principal place of business in San Francisco, California; the conduct alleged herein was conceived, directed, and carried out from California; the consumer-facing disclosures at issue were drafted and published from California; and OpenAI's Terms of Use provide that "California law will govern these Terms" and that claims arising out of or relating to the Terms "will be brought exclusively in the federal or state courts of San Francisco, California."

39. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant and plaintiff Coutu reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred here.

## DIVISIONAL ASSIGNMENT

40. Pursuant to Local Rules 3.2(c) and 3.5(b), assignment to the San Francisco Division is proper because a substantial part of the events giving rise to Plaintiffs' claims occurred in San Francisco County, and plaintiff Coutu resides in San Francisco County.

## FACTUAL ALLEGATIONS

### A. ChatGPT Invites a Private, One-to-One Exchange.

41. ChatGPT is a conversational artificial intelligence service. A consumer types a message; the service returns a response; the exchange continues.

42. OpenAI offers ChatGPT on a free tier and on paid subscription tiers, including ChatGPT Plus and ChatGPT Pro. Paid subscribers pay OpenAI a recurring monthly fee.

43. The product's design communicates privacy. There is no audience, no feed, no publication step, and no indication anywhere in the interface that a third party is present or may later be present. A consumer composing a message to ChatGPT sees only her own words and the model's reply.

44. OpenAI's Terms of Use describe the transaction in machine terms. They provide: "You may provide input to the Services ('Input'), and receive output from the Services based on the Input ('Output')." They explain the limits of the product by reference to "the probabilistic nature of machine learning."[13]

45. Where the Terms use the phrase "human review," they use it to describe what the consumer should do with the model's Output before relying on it—advising consumers to "evaluate Output for accuracy and appropriateness for your use case, including using human review as appropriate[.]"[14]

46. Because of that design and ChatGPT's representations, consumers use ChatGPT for purposes they would not pursue in public. Consumers describe medical symptoms and mental-health difficulties; discuss relationships, sexuality, and family conflict; disclose financial

[13] *Terms of Use*, *supra* note 6.

[14] *Id.*

circumstances and debts; seek help with legal and employment problems; and share details about their children.

47. OpenAI is aware of this. Its contractor instructions and its product design both reflect an understanding that ChatGPT conversations provided to the contractors carry sensitive personal information.[15]

## B. Consumers Use ChatGPT As A Private Repository For Their Most Sensitive Information.

48. That sensitivity is a function of how OpenAI, in public statements, invites users to use their service. Consumers reasonably understand and use ChatGPT as a private, nonjudgmental alternative to communicating sensitive information to another human being. OpenAI's representations and marketing reinforce this understanding. For example, OpenAI has advertised ChatGPT with the invitations to "Ask ChatGPT anything," while simultaneously promoting the service as "AI you can trust."[16]

49. OpenAI knows this is how consumers use the service. It has acknowledged that "[p]eople trust ChatGPT for many important and personal tasks" and has expressly invoked "conversation privacy" and the importance of ensuring that users' "data and conversations are protected."[17] OpenAI further recognizes that users engage ChatGPT in "personal, high-stakes, or emotionally vulnerable situations," including "mental and personal health conversations" and other "sensitive user journeys."[18]

50. Consumers' public statements reflect precisely that understanding. Users describe disclosing to ChatGPT "some of my most private thoughts that I will never tell another human soul," calling ChatGPT their "confessional" and "biggest secret keeper," and explaining that they

---

[15] Cox *supra* n. 1.

[16] *See* OpenAI Ads Library, OpenAI Ads, Sprites, https://www.sprites.ai/ads-library/openai (last visited Sept. 16, 2026) (archiving OpenAI advertising appearing in Google's and Meta's advertising libraries).

[17] Fidji Simo, *Our Approach to Advertising and Expanding Access to ChatGPT*, OpenAI (Jan. 16, 2026), https://openai.com/index/our-approach-to-advertising-and-expanding-access/.

[18] Advertising Policies, OpenAI, https://openai.com/policies/ad-policies/ (last visited Sept. 16, 2026).

"like a lot of people, [feel] more comfortable talking to an AI…than one of my friends" because the AI is "not [a] real" person and the interaction is private and nonjudgmental.[19] The fact that consumers' ChatGPT conversations may be substantively reviewed by human beings is therefore material to the privacy expectations under which consumers use the product.

### C. OpenAI Undertook to Explain What Happens to Consumers' Conversations.

51. Consumers' understanding that their conversations are not read by third-party human reviewers for model development and training is further supported by what OpenAI itself tells them when they use the service, sign-up for an account, or pay for the product. OpenAI spoke at length, across four documents presented to consumers at account creation, at the point of use, and at purchase about what it does with consumers' conversations. None of those documents disclosed that third-party human reviewers read those conversations for model development and training. Rather, they affirmatively obscured it.

#### *1. The Terms of Use*

52. The Terms of Use purport to govern consumers' use of ChatGPT and the relationship between the consumer and OpenAI.

53. The Terms direct consumers to OpenAI's policy titled "How your data is used to improve model performance." [20]

54. The Terms also direct consumers to the Privacy Policy, which OpenAI describes as explaining "how we collect and use personal information" and as "an important document that you should read."[21]

55. Nowhere do the Terms of Use state, suggest, or imply that the substance of a consumer's conversations may be displayed to and read by an individual employed by a third-party contractor for the purpose of evaluating or improving ChatGPT's responses.

---

[19] *See ChatGPT Has Become My Confessional*, Reddit (Mar. 24, 2025), https://www.reddit.com/r/ChatGPT/comments/1jj54n1/; *My Biggest Secret Keeper*, Reddit (Apr. 21, 2025), https://www.reddit.com/r/ChatGPT/comments/1k4hw9x/; *ChatGPT Has Helped Me Emotionally and It's Kind of Scary*, Reddit (Feb. 27, 2023), https://www.reddit.com/r/ChatGPT/comments/11dqz7t/.

[20] *Terms of Use*, *supra* note 6.

[21] *Id.*

### *2. The Privacy Policy*

56. OpenAI's United States Privacy Policy (most recently updated September 10, 2026) purports to "describe[] our practices with respect to personal data that we collect from or about you, and how we use it."[22]

57. Section 1 defines "Content" to include consumers' prompts and uploads.[23]

58. Section 3, "Disclosure of Personal Data," is the Policy's account of who outside OpenAI receives consumers' data. It states:

> **Vendors, Service Providers, and Marketing Partners:** To assist us in meeting business operations needs and to perform certain services and functions, we disclose Personal Data to vendors, service providers, and marketing partners, including providers of hosting services, customer service vendors, cloud services, content delivery services, support and safety services, email communication software, web analytics services, payment and transaction processors, search and shopping providers, and information technology providers. We also work with service providers who help us with age and identity verification . . . . When we work with Service Providers, these parties will access, process, or store Personal Data based on our instructions and only in the course of performing their duties to us.[24]

59. OpenAI chose to enumerate the recipients to which it discloses consumers' Personal Data. Having chosen to enumerate, it listed eleven categories of recipients. Not one of them is a data-annotation provider, a data-labeling provider, a human-evaluation or human-preference-rating provider, a reinforcement-learning-from-human-feedback vendor, a model-training contractor, or a staffing firm supplying human reviewers. Every category OpenAI listed describes infrastructure, payments, communications, security, or back-office operations—functions that a reasonable consumer would understand to be performed by systems, not by people reading her conversations.

60. Section 9 of the Privacy Policy, addressing state-law disclosure requirements, repeats the same account: OpenAI may disclose the enumerated categories of Personal Data—expressly including "Content, including your prompts"—to "[v]endors, service providers, and

---

[22] *Privacy Policy*, *supra* note 3.

[23] *Id.*

[24] *Id.*

affiliates to assist us in meeting business operations needs and to perform certain services and functions described above."[25]

61. Nowhere does the Privacy Policy state, suggest, or imply that the substance of a consumer's conversations may be displayed to and read by an individual employed by a third-party contractor for the purpose of evaluating or improving ChatGPT's responses.

***3. "How your data is used to improve model performance"***

62. Both the Terms of Use and the Privacy Policy direct consumers to a standalone OpenAI policy titled "How your data is used to improve model performance," most recently updated March 13, 2026.[26]

63. That policy exists to tell consumers what OpenAI does with their conversations when it uses them to improve its models. It states that "ChatGPT, for instance, improves by further training on the conversations people have with it, unless you opt out," and that "we may use your content to train our models."[27]

64. The policy then supplies a section captioned **"What the process looks like."** That section reads, in its entirety:

> We retain certain data from your interactions with us, but we take steps to reduce the amount of personal information in our training datasets before they are used to improve and train our models. This data helps us better understand user needs and preferences, allowing our model to become more efficient over time.[28]

65. In other words, the process, as OpenAI describes it, consists of retention, automated reduction of personal information, and machine training. The account is framed entirely in terms of datasets and model efficiency. It contains no reference to a human reader, to a contractor, to annotation, to evaluation, to rating, or to review of any kind.

66. A reasonable consumer reading these agreements would understand that the training process does not have a human review component.

---

[25] *Id.*

[26] *Model Performance Policy*, *supra* note 5.

[27] *Id.*

[28] *Id.*

#### *4. "Transparency & content moderation": OpenAI Discloses Human Review, and Confines It to Safety.*

67. The Privacy Policy also hyperlinks to a page titled "Transparency & content moderation". That page is the only document reachable from either operative agreement that discloses human review of consumers' Content at all.[29]

68. The page opens by defining its scope: "To promote safe and responsible use of our products, we use a range of procedures and tools to address content that may violate the law or our terms and policies."[30]

69. Under the heading "How we monitor and enforce," OpenAI states: "We use a combination of automated technologies and human review to monitor activity on our services, in line with our Privacy Policy." [31]

70. It then itemizes its methods as proactive automated detection, user reports, and, relevant here, "Human review: Our team may review flagged content to determine appropriate actions." [32]

71. The limitations of that disclosure are material.

72. First, the human review is disclosed as addressing content "that may violate the law or our terms and policies," and the section is titled "How we monitor and enforce."

73. The next section describes the "[e]nforcement actions" that follow. Second, the human review is disclosed as review of "flagged content"—content that has been identified by the automated systems described above or reported by a user.

74. And, finally, the review is disclosed as being performed by "[o]ur team" — that is, by OpenAI. The page does not disclose that outside contractors perform it. [33]

75. A reasonable consumer who read the Terms of Use, the Privacy Policy, the model-

---

[29] *Content Moderation*, *supra* note 2.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

improvement policy, and the content-moderation page would come away with a reasonable, coherent and specific understanding: **that a human being at OpenAI may read her conversation if it is flagged as potentially violating the rules, and that otherwise her conversation is handled by machines and by the categories of infrastructure vendors OpenAI enumerated.**

76. That understanding is incorrect.

### D. OPENAI DISCLOSES HUMAN ACCESS TO CONTENT WHEN IT CHOOSES TO.

77. OpenAI's silence about Project Lily cannot be explained as an oversight or as a failure to appreciate that consumers care who reads their conversations.

78. When OpenAI has wanted to tell consumers that a human being may read their ChatGPT Content, it has said so directly, in the operative documents, in plain language.

79. The Terms of Use, under the heading "Corporate domains," warn consumers whose accounts may be transferred to an organizational account that "the organization's administrator will be able to control your account, including being able to access Content (defined below) and restrict or remove your access to the account." [34]

80. The Privacy Policy makes the same disclosure under a dedicated heading, "Business Account Administrators": "When you join a ChatGPT Enterprise or business account, the administrators of that account may access and control your OpenAI account, including being able to access your Content."[35]

81. OpenAI thus twice identified, by name and in the governing documents, a category of human being who may read a consumer's ChatGPT conversations. It did so in a single sentence of ordinary English. Doing the same for Project Lily's contractors would have required no more.

82. OpenAI also knows that whether human beings read consumers' conversations for model training purposes is a question consumers ask and care about, because OpenAI has answered that exact question. It simply did not answer it anywhere a consumer would encounter it.

83. However, none of the disclosures presented to consumers at sign-up, purchase, or use—the Terms of Use, the Privacy Policy, the "How your data is used to improve model

---

[34] *Terms of Use*, *supra* note 6.

[35] *Privacy Policy*, *supra* note 3.

performance" article, nor the "Transparency & Content Moderation" article—answers the question.

84. The answer appears only in an article that is buried so deeply on OpenAI's help center that when reporters asked OpenAI to locate the disclosure, OpenAI could not locate it in order to respond.[36] The disclosure is buried in OpenAI's Help Center, at help.openai.com, and only after a consumer navigates through fourteen collections of articles to a collection, which comprises eighteen standalone articles and three further nested sub-collections; opens the sub-collection titled "General FAQ," which contains ten more articles; and selects the one titled "Data Usage for Consumer Services FAQ," subtitled "Commonly asked questions about how we treat user data for OpenAI's non-API consumer services like ChatGPT." Across the collection and its sub-collections, OpenAI maintains approximately forty-five separate articles.[37] Hundreds of other articles are maintained across the thirteen other collections of articles and their sub-collections.

85. If a consumer is able to find the "Data Usage for Consumer Services FAQ,"[38] the consumer must then scroll past eight questions to reach the ninth of the eleven it poses to reach the question: "Do humans view my content?" OpenAI's answer, in full:

> A limited number of authorized OpenAI personnel, as well as trusted service providers that are subject to confidentiality and security obligations, may access user content only as needed for these reasons: (1) investigating abuse or a security incident; (2) to provide support to you if you reach out to us with questions about your account, or to troubleshoot issues affecting the product experience; (3) to handle legal matters; or (4) to improve model performance (unless you have opted out). Access to content is subject to technical access controls and limited only to authorized personnel on a need-to-know basis. Additionally, we monitor and log all access to user content and authorized personnel must undergo security and privacy training prior to accessing any user content.[39]

---

[36] Cox *supra* note 1. After initial publication, OpenAI's spokes people located and provided the deeply buried FAQ page to the reporters and the article was updated.

[37] OpenAI Help Ctr., *Privacy and Policies*, https://help.openai.com/en/collections/6864268-privacy-and-policies (last visited Sept. 15, 2026).

[38] That OpenAI placed this disclosure in a section addressing questions consumers ask "frequently" underscores the materiality of the fact that human beings read their conversations to improve model performance—which is precisely why the answer belonged in the documents consumers actually receive, rather than in a help-center article most will never find.

[39] OpenAI Help Ctr., *Data Usage for Consumer Services FAQ*, https://help.openai.com/en/articles/7039943-data-usage-for-consumer-services-faq (last visited Sept. 15, 2026).

86. The fact that human beings read consumers' Content; that those the human beings include service providers, *i.e.,* personnel of outside companies rather than OpenAI's own employees alone; and that they do so for the purpose of improving model performance are withheld from the documents presented to consumers.

87. This disclosure further contrasts, and conflicts, with the Privacy Policy's dedicated section, "Disclosure of Personal Data," the express function of which is to tell consumers which outside entities receive their Personal Data. As discussed above, that statutorily required disclosure enumerates eleven categories. None is a service provider whose personnel read consumers' Content to improve model performance.

## E. PROJECT LILY.

88. On September 14, 2026, 404 Media published an investigation, based on internal OpenAI documents, reviewer instruction guides, internal Slack channels, real ChatGPT user prompts, and the review platform itself, reporting that OpenAI retains hundreds of contractors to read real ChatGPT users' conversations for the purpose of improving the model's responses. The program's internal codename is "Project Lily." [40]

89. The reviewers are not OpenAI employees. They are recruited through a staffing firm, Crossing Hurdles, which advertises roles including "AI data reviewer," "data annotator," and "chatbot evaluator," and whose listings describe responsibilities that include assessing AI responses for quality and comparing model responses side by side. [41]

90. The review workflow, as reflected in OpenAI's own instruction guides, proceeds in stages: [42]

a. The reviewer selects a task from a dashboard.

b. The reviewer is shown a real ChatGPT user's prompt. The material reviewed can comprise entire conversations between the user and the chatbot.

---

[40] *Cox*, *supra* note 1.

[41] *Id.*

[42] *Id.*

c. The reviewer writes a short summary of what the reviewer believes the user is asking or trying to do. An example given in OpenAI's own guide describes a user seeking help revising a work message.

d. The reviewer is shown four ChatGPT-generated responses and must highlight at least three specific passages as aligned or misaligned with the target model behavior, and explain why.

e. The reviewer scores each response on a scale from one ("unacceptable, unusable") to seven ("would be hard to meaningfully improve").

f. The reviewer writes a rationale for the score, ranging from a few sentences to a full paragraph.

91. The reviewers' work product is fed back into OpenAI's model development. Internal guidance directs reviewers to penalize responses that anthropomorphize the model, that are sycophantic, that misuse emoji, that mimic the user's style, or that end with engagement bait; and to flag missing sources in high-stakes medical, legal, and financial responses. Documents governing the work are marked "Confidential & Proprietary." [43]

92. This activity is categorically distinct from the safety and content-moderation review OpenAI has disclosed. It is not triggered by a flag. It is not addressed to content that violates OpenAI's terms. It does not lead to an enforcement action. And it is not performed by "[o]ur team."

93. The conversations reviewers read contain personal information. OpenAI's instruction guide to reviewers directs them to escalate tasks they encounter that contain personal information—an internal acknowledgment that personal information reaches reviewers' screens. [44]

94. OpenAI processes conversations through an automated filtering model. OpenAI's published documentation for that model states that it "is a redaction and data minimization aid, not an anonymization, compliance, or a safety guarantee," and that like all models it can make mistakes, including under-detecting uncommon names, regional naming conventions, initials, honorific-

---

[43] *Id.*

[44] *Id.*

heavy references, and domain-specific identifiers, and under-redacting when context is limited. OpenAI acknowledged that sensitive details can still reach reviewers. [45]

95. The reviewer's screen may also display a summary of the user's prior interactions with ChatGPT, which can indicate what the user has previously used the chatbot for and, in some cases, where in the world the user lives.[46]

96. A person who works with the prompts, asked whether ChatGPT users know that humans read their chats, said they do not, and that users would not imagine that a contractor somewhere is analyzing their conversations. Some of the prompts reviewers encounter make the point directly—even going so far as to ask ChatGPT to keep what the user has said to itself.[47]

97. When asked to identify where it had explicitly told users that humans may review their prompts in order to improve ChatGPT's responses, OpenAI did not answer. After being contacted for comment, OpenAI updated its help page concerning the "improve the model for everyone" setting to add detail about how users can opt out. That page still does not acknowledge that humans may read users' prompts.[48]

### F. THE OMITTED FACT WAS MATERIAL.

98. Whether an unrelated human being will read the substance of one's private communications is among the most consequential facts a consumer could know about a communications service.

99. A consumer necessarily understands that typing a message into an artificial-intelligence service causes a computer system to process it. That understanding carries no implication about human observation.

---

[45] *Model Card for OpenAI Privacy Filter*, https://huggingface.co/openai/privacy-filter (last visited Sept. 15, 2026); *Introducing OpenAI Privacy Filter*, OpenAI (Apr. 22, 2026), https://openai.com/index/introducing-openai-privacy-filter/; *see Cox*, *supra* note 1.

[46] *Cox*, *supra* note 1.

[47] *Id.*

[48] *Id.*

100. Machine processing is impersonal, transient, and non-judgmental; a computer system does not recognize the user, form an impression of her, or remember her embarrassment. Human observation is none of those things.

101. The reviewer in Project Lily does not merely process the conversation—the reviewer interprets it, summarizing in her own words what she believes the user was trying to do.

102. The distinction is sharpest precisely where ChatGPT is most used and most valuable, medical and mental-health questions, relationship and sexual matters, financial difficulty, legal exposure, employment problems, family disputes, and information about children.

103. OpenAI's conduct further establishes that human review is material. For example:

a. It expressly disclosed human review for safety purposes on a dedicated transparency page;

b. It expressly disclosed human access to Content by business-account administrators, twice, in the operative documents; and

c. It updated its consumer-facing opt-out guidance within hours of being contacted by a reporter about human review.[49]

104. Reasonable consumers, including Plaintiffs, would consider it important in deciding whether to use ChatGPT, whether to pay for ChatGPT, and what to say to ChatGPT, that the substance of their conversations may be read and evaluated by a person employed by an outside company.

## G. California Law Measures Disclosure By What Consumers Reasonably Expect.

105. California's privacy regime evaluates processing and disclosure by reference to consumers' reasonable expectations and the actual context of collection.

106. The California Consumer Privacy Act requires that a business's collection, use, retention, and sharing of personal information "shall be reasonably necessary and proportionate to achieve the purposes for which the personal information was collected or processed, or for another

---

[49] *Id.*

disclosed purpose that is compatible with the context in which the personal information was collected." Cal. Civ. Code § 1798.100(c).

107. The implementing regulations require that the purposes for which personal information is collected or processed be "consistent with the reasonable expectations of the consumer(s) whose personal information is collected or processed." 11 C.C.R. § 7002(b).

108. The regulations identify the factors that determine those reasonable expectations. They include "[t]he type, nature, and amount of personal information that the business seeks to collect or process," *id.* § 7002(b)(2); "[t]he specificity, explicitness, prominence, and clarity of disclosures to the consumer(s) about the purpose for collecting or processing their personal information," *id.* § 7002(b)(4); and "[t]he degree to which the involvement of service providers, contractors, third parties, or other entities in the collecting or processing of personal information is apparent to the consumer(s)," *id.* § 7002(b)(5).

109. The regulation supplies an illustration directly applicable here. A consumer who orders a product online likely expects her address to be given to a delivery service, because the delivery company's involvement is apparent. But "the consumer may not expect the disclosure of personal information to a service provider if the consumer is not directly interacting with the service provider or the service provider's role in the processing is not apparent to the consumer." *Id.* § 7002(b)(5).

110. The regulations further require that consumer-facing privacy disclosures be "easy to read and understandable to consumers," using "plain, straightforward language" and avoiding "technical or legal jargon," 11 C.C.R. § 7003(a)-(b), and provide that a privacy policy exists to give consumers "a comprehensive description of a business's online and offline information practices," *id.* § 7011(a).

**H. THE CHALLENGED OMISSION.**

111. OpenAI, having undertaken to describe how consumers' Content is used, processed, improved upon, monitored, and disclosed to third parties—and having done so in detail, across four separate consumer-facing documents, including one published for the specific purpose of explaining "[w]hat the process looks like"—omitted the material fact that the substance of

consumers' ChatGPT conversations may be transmitted to third-party annotation providers whose human personnel read, summarize, evaluate, and score those communications (the "Challenged Omission").

112. The Challenged Omission rendered OpenAI's partial descriptions misleading. By describing the secondary use of consumers' communications as retention, automated reduction of personal information, and machine training; by enumerating eleven categories of vendor recipients, none of which perform human review; and by disclosing human review of Content in a single, expressly limited context—flagged content, reviewed by OpenAI's own team, for enforcement purposes—OpenAI created the false impression that model training and improvement involve technological processing of consumers' communications rather than the reading of those communications by outside human beings.

113. OpenAI had superior and exclusive knowledge of the omitted facts. Plaintiffs and Class members could not have discovered the omitted facts through reasonable diligence.

114. At all relevant times, OpenAI was aware that its consumer-facing disclosures did not describe the human review conducted through Project Lily.

115. A reasonable consumer would be deceived by disclosures and omissions of the kind OpenAI made.

116. A reasonable user reading OpenAI's disclosures would not understand that she was agreeing to have her conversations read by a third-party human contractor.

117. Plaintiffs and Class members were deprived of information material to their decision whether to use ChatGPT and what to disclose to it, and of the ability to protect their own privacy by withholding information they would not have shared had they known a stranger might read it.

118. The substance of Plaintiffs' and Class members' private communications was conveyed to and read by persons with whom they had no relationship, for a purpose they were never told of, causing a loss of privacy that is itself a cognizable injury.

119. Plaintiffs and Class members were deprived of the value of the data extracted from their communications and used to generate work product of commercial value to OpenAI.

120. The Subscriber class members paid for ChatGPT subscriptions. The privacy characteristics of a service to which consumers entrust their private communications are a material component of the value of that service. Had OpenAI disclosed the Challenged Omission, the Subscriber Subclass members would not have purchased subscriptions, or would have paid less for them. They therefore paid a price premium and did not receive the benefit of their bargain.

121. Absent injunctive relief, the conduct will continue. OpenAI has not, to date, disclosed the practice in the Terms of Use, the Privacy Policy, the model-improvement policy, or at the point of first use, account creation or purchase. Plaintiffs continue to use ChatGPT and/or would use ChatGPT in the future if OpenAI's disclosures were accurate and remain subject to the practice.

### I. Plaintiffs' Experiences.

122. Vredenburgh is and has been a paying subscriber of ChatGPT, used ChatGPT regularly during the relevant period, and disclosed to it information of a personal and sensitive nature, including mental-health concerns, including symptoms, diagnoses, and treatment; questions concerning sexual health and sexual matters; physical symptoms, health conditions, diagnoses, treatments, and prescription medications, including for the purpose of understanding information Vredenburgh had received from health-care providers; difficulties in Vredenburgh's romantic relationship and in her family life; private thoughts, anxieties, and personal reflections that Vredenburgh had not disclosed to any other person; and address financial circumstances and debts, employment difficulties, and legal questions. Vredenburgh's conversations included details identifying her and were conducted in the belief that they would not be viewed by humans unless they were flagged for safety purposes.

123. Vredenburgh did not understand, and nothing OpenAI disclosed to her conveyed, that the substance of her conversations might be displayed to and read by an individual employed by an outside company for the purpose of evaluating and improving ChatGPT's responses.

124. Coutu used ChatGPT regularly during the relevant period and disclosed to it information of a personal and sensitive nature, including financial circumstances, including income, expenses, obligations, and financial decisions; information identifying Coutu's location,

including where Coutu lives, works, and travels; and private work and business matters, including internal and non-public aspects of Coutu's employment and business activities. Coutu's conversations included details identifying Coutu, and were conducted in the belief that they would not be viewed by humans unless they were flagged for safety purposes.

125. Coutu did not understand, and nothing OpenAI disclosed to him conveyed, that the substance of his conversations might be displayed to and read by an individual employed by an outside company for the purpose of evaluating and improving ChatGPT's responses.

126. Before creating a ChatGPT account and/or using ChatGPT, Plaintiffs were presented with OpenAI's Terms of Use, Privacy Policy, and the documents directly incorporated therein. As a result, they reasonably understood that their conversations would be processed by machines to improve OpenAI's models, and that a human being would read their conversation only if it were flagged for review by OpenAI's own safety team. They relied on that understanding in deciding to use the product, to create an account, to purchase a subscription, and in deciding what to disclose to ChatGPT. Had OpenAI adequately disclosed the Challenged Omission, Plaintiffs would not have purchased a subscription or would have paid less for one; would not have used ChatGPT for the sensitive purposes for which they used it; and/or would have made different decisions about what to say to it. Had OpenAI disclosed the Challenged Omission in its Terms of Use, its Privacy Policy, the documents directly incorporated therein, or at the point of account creation, first use, or purchase, Plaintiffs would have been aware of the disclosure.

## TOLLING

127. **Discovery rule.** Plaintiffs' and Class members' claims did not accrue until they knew or reasonably could have known of the Challenged Omission. Project Lily was not publicly known until September 14, 2026. The practice was not disclosed in any document OpenAI presented to consumers and could not have been discovered through reasonable diligence.

128. **Fraudulent concealment.** OpenAI actively concealed the practice by publishing consumer-facing descriptions of its Content-processing practices that omitted it, including a policy

captioned “What the process looks like” that described the process without its human component. Any applicable limitations period is tolled. [50]

129. **Estoppel.** OpenAI was under a continuous duty to disclose the true character of its Content-processing practices. Having knowingly failed to do so while representing that its disclosures were comprehensive, OpenAI is estopped from relying on any statute of limitations.

## CLASS ALLEGATIONS

130. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Classes:

a. **Nationwide Class**: All persons in the United States who used ChatGPT during the applicable statute of limitations period.

b. **California Subclass**: All persons in California who used ChatGPT during the applicable statute of limitations period.

c. **Subscriber Subclass**: All members of the Nationwide Class who paid for a ChatGPT subscription during the applicable statute of limitations period.

d. **California Subscriber Subclass**: All members of the California Subclass who paid for a ChatGPT subscription during the applicable statute of limitations period.

131. Excluded from the Classes are: (i) any Judge or Magistrate presiding over this action and members of their families; (ii) Defendant, Defendant’s subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiffs’ counsel and Defendant’s counsel; (vi) users of ChatGPT Enterprise, ChatGPT Business, ChatGPT Team, and ChatGPT Edu accounts, and API customers and (v) the legal representatives, successors, and assigns of any such excluded persons.

132. Plaintiffs reserve the right to amend, modify, or add Classes or Subclasses following discovery.

---

[50] *Model Performance*, *supra* note 5.

133. **Numerosity**: The exact number of the members of the Classes is unknown and not available to Plaintiffs at this time, but individual joinder is impracticable. On information and belief, Defendant has hundreds of millions of users who fall into the definition of the Classes. Members of the Classes can be identified through Defendant's records.

134. **Commonality and Predominance**: There are questions of law and fact common to the claims of Plaintiffs and the alleged Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the members of the Classes include, but are not necessarily limited to the following:

a. whether OpenAI adequately disclosed that practice in consumer-facing documents members of the Classes were exposed to;

b. whether the omitted fact is material to a reasonable consumer;

c. whether OpenAI's disclosures, read together, were likely to deceive a reasonable consumer;

d. whether OpenAI's statements concerning its Content-processing practices were untrue or misleading within the meaning of Cal. Bus. & Prof. Code § 17500;

e. whether OpenAI's partial descriptions of its Content-processing practices gave rise to a duty to disclose the omitted fact;

f. whether OpenAI's conduct violates the UCL, the CLRA, and the FAL;

g. whether OpenAI's conduct constitutes intrusion upon seclusion and a violation of the California Constitution;

h. whether OpenAI was unjustly enriched; and

i. the appropriate measure of restitution, damages, and injunctive relief.

135. **Typicality**: Plaintiffs' claims are typical of the claims of members of the Classes. The claims arise from a common nucleus of operative fact—inter alia, Plaintiffs used ChatGPT, was subject to the same disclosures, and was injured by the same omission, in the same way, as every other Class member.

136. **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex

litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes. That is, Plaintiffs and the members of the Classes sustained injuries and damages as a result of Defendant's conduct. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any conflicts with or interests adverse to the Classes.

137. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Classes is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint as well as the risk of inconsistent adjudication. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Through a class action, economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

138. Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definitions" based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATION OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 *et seq.*
### (***On Behalf of Plaintiffs & the Classes, in the alternative***)

139. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

140. Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant, each and in the alternative.

141. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice."

### *A. Fraudulent Prong*

142. OpenAI's disclosures were likely to deceive reasonable consumers. OpenAI represented that consumers' Content is used to provide and improve the Services and to train its models; enumerated the categories of outside recipients of consumers' Personal Data, none of which perform human review; published a policy purporting to explain "[w]hat the process looks like" that described only retention, automated redaction, and machine training; and disclosed human review of Content only as review of flagged content by OpenAI's own team for enforcement purposes. Taken together, those representations conveyed to reasonable consumers that the improvement of OpenAI's models is a technological process, and not one in which outside individuals read the substance of consumers' conversations.

143. That impression was false.

144. OpenAI made extensive partial representations about the processing, use, and third-party disclosure of consumers' Content and suppressed the Challenged Omission. Having spoken at length on the subject, OpenAI omitted a fact that materially qualified what it said.

145. OpenAI owed Plaintiffs and the members the classes a duty to disclose the omitted fact.

146. OpenAI made partial representations.

147. OpenAI had exclusive knowledge of the omitted fact. Project Lily is an internal OpenAI program; the documents governing it are marked "Confidential & Proprietary"; and its existence was not publicly known until September 14, 2026. Plaintiffs and Class members could not have learned of it through reasonable diligence.

148. OpenAI actively concealed the omitted fact.

149. A reasonable consumer is not required to look beyond a company's representations in order to discover the truth elsewhere. California's privacy regulations confirm the point: consumer-facing privacy disclosures must be prominent, plain, and understandable, and a privacy policy exists to supply consumers a comprehensive description of a business's information practices. The omitted fact was therefore neither reasonably accessible to nor reasonably discoverable by Plaintiffs and Class members.

150. The omitted fact also relates to the central function of the product. ChatGPT's function is to receive information that consumers type into it and to respond to that information; the confidentiality of what a consumer types is not incidental to the service but definitional of it.

151. In the alternative, and independent of any duty to disclose, members of the public are likely to be deceived. OpenAI's disclosures, read together and in the context in which consumers encounter them, were likely to deceive members of the public for the reasons alleged above.

152. Plaintiffs relied on OpenAI's representations. Had OpenAI disclosed the Challenged Omission in the documents presented to users at the point of account creation, first use, or purchase, Plaintiffs would have acted differently.

***B. Unfair Prong***

153. OpenAI's conduct is unfair because it is tethered to, and violates, public policy legislatively and administratively declared in Cal. Civ. Code § 1798.100 *et. seq.* and 11 C.C.R. §§ 7002 *et seq*—namely, that processing of personal information be consistent with consumers' reasonable expectations; that the specificity, explicitness, prominence, and clarity of disclosure and the apparency of a service provider's role determine those expectations; that processing be reasonably necessary and proportionate to disclosed purposes compatible with the context of collection; and that consumer-facing privacy disclosures be comprehensive and understandable.

154. Alternatively, OpenAI's conduct is unfair under the balancing test. The harm to consumers—the exposure of the substance of private communications, including intimate and sensitive communications, to unrelated individuals without notice—vastly outweighs any utility of the practice, which OpenAI could obtain lawfully by disclosing it. The harm was not reasonably avoidable, because consumers could not learn of the practice from anything OpenAI published.

***C. Unlawful Prong***

155. OpenAI's conduct violates the CLRA and the FAL, and intrusion upon seclusion, Cal. Civ. Code § 1798.100 *et seq.* and 11 C.C.R. §§ 7002 *et seq.*, and a violation of Article I, Section 1 of the California Constitution, each of which serves as an independent predicate.

***D. Relief***

156. Plaintiffs and Class members lost money or property. Subscribers paid subscription fees they would not have paid or would have paid at a lower amount. All Class members were deprived of the value of data taken from their communications.

157. For example, there is an established commercial market for prompts designed for use with ChatGPT and other generative-AI systems. Commercial marketplaces exist for the specific purpose of monetizing such prompts.

158. For example, PromptBase operates a marketplace through which users buy and sell AI prompts, including prompts specifically designed for ChatGPT. PromptBase currently advertises more than 330,000 tested prompts and expressly invites users to “Sell Your Prompts” and earn money from them.

159. By causing Plaintiffs’ and Class members’ prompts to be accessed, reviewed, and annotated by human reviewers without adequate disclosure or authorization, OpenAI deprived Plaintiffs and members of the Classes of exclusive control over the use and dissemination of their economically valuable prompts and appropriated for itself and its service providers a use of those prompts for which Plaintiffs and the members of the Classes received no compensation.

160. Plaintiffs seek restitution, disgorgement of amounts OpenAI acquired by means of the unfair competition, and injunctive relief. Plaintiffs plead these equitable remedies in the alternative and lack an adequate remedy at law: the restitution and injunctive relief available under the UCL are broader than the legal remedies available under Plaintiffs’ other claims, and damages alone cannot redress the ongoing and prospective exposure of consumers’ communications to third-party human reviewers.

161. **Public Injunctive Relief.** Plaintiffs further seek public injunctive relief, on behalf of the general public, in the form of an order:

a. enjoining OpenAI from transmitting the substance of any consumer's ChatGPT conversation to any third party for human review for model-improvement purposes unless the consumer has first given affirmative, express consent through a standalone disclosure presented separately from the Terms of Use and the Privacy Policy;

b. requiring that OpenAI's “improve the model for everyone” setting, or any successor setting, be set to off by default for every new consumer account, and that the choice be presented symmetrically, such that declining is as easy as, and requires no more steps than, agreeing, *see* 11 C.C.R. § 7004;

c. requiring OpenAI to disclose, clearly and conspicuously in the ChatGPT interface at the point at which a consumer enters Content, on the public-facing pages at which prospective consumers create accounts and purchase subscriptions, and in the Terms of Use and the Privacy Policy, that conversations may be displayed to and read, summarized, scored, and critiqued by individuals employed by third-party companies for model-improvement purposes; that a reviewer may be shown an entire conversation and a summary of the consumer's prior interactions with ChatGPT; and that OpenAI's automated redaction is a data-minimization aid and not a guarantee that personal information will be removed;

d. requiring that each such disclosure be at least as prominent as the statement it corrects; requiring OpenAI to amend the section of its Privacy Policy captioned “Disclosure of Personal Data” to identify data-annotation, data-labeling, and human-evaluation providers among the enumerated categories of recipients; and requiring OpenAI to amend the section captioned "What the process looks like" to describe the human-review component of that process;

e. requiring OpenAI to certify its compliance to the Court and to maintain the required disclosures for so long as it engages in the practice; and

f. enjoining OpenAI from using, deploying, offering, or making available to the public any reward model, preference model, model checkpoint, or model version that was developed using annotations, ratings, summaries, highlighted passages, scores, or written rationales derived from consumers’ Content obtained without the consent described above; requiring OpenAI to identify and delete that reviewer work product; and requiring OpenAI to delete or retrain any such model, so that the models OpenAI offers to the public going forward are not the product of the undisclosed practice.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT

**Cal. Civ. Code § 1750, *et seq.***
***(On Behalf of Plaintiffs & the Classes, in the alternative)***

162. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

163. Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant, each and in the alternative.

164. Plaintiffs and the members of the Classes are "consumers" who engaged in "transactions" for "services" within the meaning of Cal. Civ. Code §§ 1761(d), (e), and 1770(a). OpenAI is a "person" under § 1761(c).

165. OpenAI violated Cal. Civ. Code § 1770(a) by:

a. § 1770(a)(5) — representing that ChatGPT has characteristics, uses, or benefits that it does not have;

b. § 1770(a)(7) — representing that ChatGPT is of a particular standard, quality, or grade when it is of another;

c. § 1770(a)(9) — advertising ChatGPT subscriptions with intent not to sell them as advertised;

d. § 1770(a)(14) — representing that the transaction confers or involves rights, remedies, or obligations that it does not have or involve; and

e. § 1770(a)(16) — representing that ChatGPT has been supplied in accordance with a previous representation when it has not.

166. Each violation arises from the Challenged Omission, which OpenAI had a duty to disclose as discussed above.

167. The omitted fact was material. A reasonable consumer would attach importance to it in deciding whether to purchase a ChatGPT subscription or use ChatGPT. Plaintiffs and members of the Subscriber Subclasses either would not have used or would not have purchased, or would have paid less for, ChatGPT had the fact been disclosed. All Class members were deprived of the value of data taken from their communications. For example, there is an established commercial market for prompts designed for use with ChatGPT and other generative-AI systems. Commercial

marketplaces exist for the specific purpose of monetizing such prompts. For example, PromptBase operates a marketplace through which users buy and sell AI prompts, including prompts specifically designed for ChatGPT. PromptBase currently advertises more than 330,000 tested prompts and expressly invites users to "Sell Your Prompts" and earn money from them.

168. Defendant's misrepresentations and omissions were material because a reasonable consumer would consider them important in deciding whether to purchase or use Defendant's products or services. Had Plaintiffs and the members of the Classes known the truth they would not have purchased or used Defendant's products or would have paid substantially less for them or would have withheld the information they disclosed to ChatGPT.

169. Plaintiffs and the members of the Classes relied on Defendant's misrepresentations and omissions in deciding to purchase Defendant's products. Defendant's misrepresentations and omissions were made in, inter alia ,Defendant's Privacy Policy and related policies, all of which were designed to, and did, induce consumers to purchase Defendant's products.

170. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiffs and the members of the Classes have suffered injury-in-fact, including (i) the loss of money paid for ChatGPT subscriptions they would not otherwise have purchased, or would have purchased at a lower price, had they known the truth; (ii) the diminution in value of a service that does not possess the privacy characteristics that were represented; and (iii) the loss of the value of the personal data extracted from their communications and disclosed to third-party human reviewers.

171. **CLRA notice.** On September 16, 2026, Plaintiffs sent notice by certified mail, return receipt requested, to OpenAI at its principal place of business, in compliance with Cal. Civ. Code § 1782(a), identifying the violations alleged and demanding correction. Plaintiffs presently seeks injunctive and declaratory relief only under this Count. If OpenAI fails to provide appropriate

relief within 30 days, Plaintiffs will amend to seek actual, statutory, and punitive damages under § 1780(a).

172. Plaintiffs file concurrently the affidavit required by Cal. Civ. Code § 1780(d).

173. Plaintiffs seek injunctive relief, restitution, and attorneys' fees and costs under Cal. Civ. Code § 1780(e).

174. **Public Injunctive Relief**. Plaintiffs further seek public injunctive relief as described above.

## THIRD CAUSE OF ACTION

### VIOLATION OF THE FALSE ADVERTISING LAW
### Cal. Bus. & Prof. Code § 17500, *et seq.*
### *(On Behalf of Plaintiffs & the Classes, in the alternative)*

175. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

176. Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant, each and in the alternative.

177. Section 17500 makes it unlawful for any person, with intent directly or indirectly to dispose of services or to induce the public to enter into any obligation relating thereto, to make or disseminate before the public in California any statement concerning those services which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

178. OpenAI made and disseminated before the public in California, over the Internet, the statements described above concerning ChatGPT and OpenAI's handling of consumers' conversations. Each is published on openai.com and is accessible to any member of the public without an account, a login, or a purchase.

179. Foremost among them is OpenAI's policy titled "How your data is used to improve model performance." That document's sole function is explanatory: to tell consumers and prospective consumers what OpenAI does with their conversations. OpenAI published it for that purpose, directs consumers to it from both the Terms of Use and the Privacy Policy, and captioned

a section of it "What the process looks like." In that section OpenAI told the public that the process consists of retention of certain data, automated steps to reduce personal information in training datasets, and the resulting improvement of model efficiency.

180. OpenAI also disseminated to the public its Privacy Policy, which enumerated eleven categories of vendors and service providers that receive consumers' Personal Data—none of which performs human review of consumers' conversations—and represented that such parties access Personal Data "only in the course of performing their duties to us"; and its "Transparency & content moderation" page, which told the public that human review of Content consists of review by OpenAI's own team of content flagged as potentially violating the law or OpenAI's policies.

181. Each of these affirmative statements was untrue or misleading when made. Each described OpenAI's handling of consumers' conversations in terms that excluded the reading, summarizing, and grading of those conversations by individuals employed by outside contractors, when OpenAI was doing precisely that. Each was rendered misleading by the Challenged Omission.

182. OpenAI knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading. OpenAI designed and operated Project Lily, drafted the instruction guides that govern it, and authored each of the statements identified above.

183. OpenAI disseminated the statements with the intent to induce the public to use ChatGPT, to create and maintain ChatGPT accounts, and to purchase and renew ChatGPT subscriptions.

184. The statements were material and likely to deceive a reasonable consumer. Plaintiffs and Class members reasonably relied on OpenAI's description of its Content-processing practices, and as a result lost money or property: Subscriber Subclass members paid subscription fees they would not have paid, or would have paid at a lower amount, and all Class members were deprived of the value of the data extracted from their communications.

185. Plaintiffs seek an injunction under Cal. Bus. & Prof. Code § 17535 restraining OpenAI from continuing to disseminate the misleading statements identified above and requiring corrective disclosure; restitution; and attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

Plaintiffs plead these equitable remedies in the alternative and lack an adequate remedy at law for the reasons alleged above.

186. **Public Injunctive Relief**. Plaintiffs further seek public injunctive relief as described above.

## FOURTH CAUSE OF ACTION

### FRAUDULENT OMISSION AND CONCEALMENT
**(*On Behalf of Plaintiffs & the Nationwide Class or the California Subclass*)**

187. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

188. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendant. Alternatively, Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendant.

189. OpenAI concealed and suppressed the Challenged Omission—a material fact concerning the processing and third-party disclosure of consumers' private communications.

190. OpenAI had a duty to disclose because (a) it made partial representations concerning the processing, use, monitoring, and third-party disclosure of consumers' Content while suppressing the Challenged Omission, (b) it had exclusive knowledge of material facts not known to, and not reasonably discoverable by, Plaintiffs and Class members, and (c) it actively concealed the Challenged Omission by, inter alia, confining any acknowledgment of third-party human review to a buried Help Center article, and by revising its consumer-facing opt-out guidance, within hours of a reporter's inquiry, without acknowledging that human beings read consumers' prompts.

191. OpenAI concealed the fact intentionally and with the intent to induce consumers to use and to pay for ChatGPT. OpenAI knew that disclosure would deter use and purchase and would expose it to the reputational and regulatory consequences that followed publication.

192. Plaintiffs and Class members were unaware of the concealed fact and would have acted differently had they known it—by declining to subscribe, by paying less, by declining to use ChatGPT, or by withholding the information they disclosed to it.

193. Plaintiffs justifiably relied on OpenAI's representations concerning the processing, use, and third-party disclosure of their Content, and on the absence from those representations of any indication that individuals employed by outside companies would read their conversations. That reliance was justifiable because OpenAI authored and controlled each of the documents in which the representations appear, because OpenAI had exclusive knowledge of the omitted fact, and because nothing OpenAI presented to consumers put Plaintiffs on notice of it.

194. Plaintiffs and Class members were damaged. OpenAI's conduct was willful, oppressive, and malicious, and was carried out with conscious disregard for consumers' privacy rights, warranting punitive damages.

## FIFTH CAUSE OF ACTION

### INTRUSION UPON SECLUSION
**(*On Behalf of Plaintiffs & the Nationwide Class or the California Subclass*)**

195. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

196. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendant. Alternatively, Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendant.

197. Plaintiffs and Class members had an objectively reasonable expectation of privacy in the contents of their ChatGPT conversations. That expectation was reasonable in light of the product's design, which presents the exchange as a private one-to-one communication; OpenAI's representations that Content is processed to provide and improve the Services and disclosed to enumerated categories of infrastructure vendors; OpenAI's representation that human review of Content occurs in a single, limited, enforcement-related context; and the nature of the communications themselves.

198. OpenAI's disclosures reinforced that expectation. By identifying, in plain language and in its operative documents, the categories of human being who may access a consumer's Content—business-account administrators, and OpenAI's own team reviewing flagged content for

enforcement purposes—OpenAI created the reasonable impression that human access outside those identified categories does not occur.

199. OpenAI intentionally intruded upon that seclusion by transmitting the substance of Plaintiffs' and Class members' private communications to third parties and causing those communications to be read, interpreted, summarized, and evaluated by individuals employed by those third parties.

200. The intrusion was highly offensive to a reasonable person. It involved the substance of private communications, including intimate and sensitive communications; it was conducted without notice; it exceeded any disclosed purpose; it was undertaken for commercial gain; and it exposed communications that consumers had been led to believe were handled by machines to unvetted individuals working through staffing intermediaries.

201. Any consent OpenAI obtained did not extend to this conduct. No disclosure OpenAI presented to consumers conveyed that the substance of their conversations would be routed to individuals employed by outside companies and read, summarized, scored, and critiqued for model-improvement purposes.

202. Plaintiffs and Class members suffered injury, including loss of privacy and the mental anguish attendant to learning that strangers read their private communications. Plaintiffs seek nominal, compensatory, and punitive damages, and injunctive relief.

## SIXTH CAUSE OF ACTION

### INVASION OF PRIVACY
### (*On Behalf of Plaintiffs & the Nationwide Class or the California Subclass*)

203. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

204. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendant. Alternatively, Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendant.

205. The right to privacy in California's constitution creates a right of action against private entities such as Defendant.

206. Plaintiffs' and class members' expectation of privacy is deeply enshrined in California's Constitution.

207. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property and obtaining safety, happiness, and privacy."

208. The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11.

209. Critically, the argument in favor of Proposition 11 reveals the legislative intent was to curb business' control over unauthorized collection and use of consumers' personal information:

> The right of privacy is the right to be left alone ... It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

210. The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

211. Plaintiffs and the class members have a legally protected interest in preventing the unauthorized collection, aggregation, and dissemination of their personal information, particularly when this data reflects sensitive aspects of their personal lives; and an autonomy interest in making intimate personal decisions without observation.

212. Plaintiffs and the class also have a strong interest in preventing the widespread distribution of private conversations to unknown third parties without their knowledge or consent.

213. Their expectation of privacy was reasonable under the circumstances, for the reasons alleged above.

214. OpenAI's conduct constitutes a serious invasion of that interest. The communications at issue are among the most sensitive that consumers generate; the disclosure was to unrelated individuals; the scope was vast; and the consumers affected had no notice and no opportunity to object.

215. OpenAI has no countervailing interest that justifies the invasion. The asserted purpose—improving model responses—could be served by obtaining informed consent, as OpenAI's industry peers have done by disclosing human review in-product.

216. Indeed, Google has placed a notice in the chat interface itself informing users that "[y]our conversations are processed by human reviewers to improve the technologies powering [the service]," and instructing them: "Don't enter anything you wouldn't want reviewed or used." That notice appeared where the user was about to type, alongside a link explaining how to opt out—not in a help-center article reachable only by navigating a collection of dozens of others.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Code §§ 1798.100 *et seq.***
**(*<u>On behalf of Plaintiffs & the Nationwide Class or the California Subclass</u>*)**

217. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

218. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendant. Alternatively, Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendant.

219. In 2018, California consumers voted into law the California Consumer Privacy Act of 2018 ("CCPA"). The CCPA gives California consumers the right to learn what information a business has collected about them, to control how that information is used and disclosed, and to hold businesses accountable if they do not take reasonable steps to safeguard protected information.

220. In further protecting consumers' rights, including the constitutional right to privacy, the CCPA states that one purpose and intent of the act is to allow consumers "to control the use of their personal information, including limiting the use of their sensitive personal information, the unauthorized use or disclosure of which creates a heightened risk of harm to the consumer," and to provide consumers with "meaningful options" over how information is collected, used, and disclosed.

221. To that end, businesses are required to inform consumers specifically and clearly about how those businesses collect and use personal information and how consumers can exercise

their rights and choices. The CCPA further provides that businesses should collect consumers' personal information only for specific, explicit, and legitimate disclosed purposes and should not further collect, use, or disclose consumers' personal information for reasons incompatible with those purposes.

222. These guiding principles are codified in California Civil Code §§ 1798.100 et seq. Subsection (a)(1) of § 1798.100 provides that a business shall not collect additional categories of personal information or use personal information collected for additional purposes that are incompatible with the disclosed purpose for which the personal information was collected without providing the consumer with notice. Subsection (a)(2) requires the same for sensitive personal information.

223. California Civil Code § 1798.100(c) further provides that a business' collection, use, retention, and sharing of a consumer's personal information shall be reasonably necessary and proportionate to achieve the purposes for which the personal information was collected or processed, or for another disclosed purpose that is compatible with the context in which the personal information was collected, and not further processed in a manner that is incompatible with those purposes.

224. To achieve the CCPA's objectives and safeguard consumers' information, subsection (e) of § 1798.100 requires a business that collects consumers' personal information to implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Section 1798.81.5.

225. Similarly, California Civil Code § 1798.81.5(b) provides that a business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.

226. OpenAI is a "business" within the meaning of California Civil Code § 1798.140(d), and Plaintiffs and members of the California Subclass are "consumers" within the meaning of §

1798.140(i). OpenAI collects consumers' personal information, determines the purposes and means of processing that information, does business in California, and satisfies the thresholds set forth in § 1798.140(d)(1). Plaintiffs and members of the California Subclass disclosed personal information to OpenAI.

227. As alleged in detail above, OpenAI's Privacy Policy does not identify data-annotation, data-labeling, human-evaluation, or model-training providers as recipients of consumers' personal information, nor does OpenAI acknowledge anywhere in its consumer-facing documents that it retains outside contractors to read consumers' conversations. OpenAI also fails to disclose to consumers that it routes the substance of their conversations to third-party companies whose personnel read, summarize, score, and critique those conversations.

228. Indeed, OpenAI's only disclosure of information sharing states that it discloses personal data to "vendors, service providers, and marketing partners," which it then enumerates as providers of hosting services, customer service vendors, cloud services, content delivery services, support and safety services, email communication software, web analytics services, payment and transaction processors, search and shopping providers, information technology providers, and age- and identity-verification providers, and represents that those parties access personal data "only in the course of performing their duties to us." Nowhere does OpenAI's Privacy Policy, its Terms of Use, or its policy captioned "How your data is used to improve model performance" state that OpenAI will disclose the substance of consumers' private conversations to annotation companies for the additional purpose of having their employees read, evaluate, and grade those conversations in order to train and improve OpenAI's commercial models. That purpose goes well beyond the disclosed purpose of providing the ChatGPT service and is a clear breach of OpenAI's duties under California Civil Code § 1798.100.

229. Further, OpenAI's disclosure to third-party annotation companies of, and the unauthorized access by those companies' personnel to, Plaintiffs' and California Subclass members' personal information was made without Plaintiffs' or Class members' knowledge, consent, or authorization, and for a purpose incompatible with and undisclosed at the time of collection.

230. OpenAI further failed to implement and maintain reasonable security procedures and practices appropriate to the nature of that information. OpenAI transmitted the substance of consumers' conversations to hundreds of individuals employed by outside companies and recruited through a staffing firm, and interposed as its only safeguard an automated filtering model that OpenAI itself describes as inadequate to the task.

231. By OpenAI's own published documentation, that model "is a redaction and data minimization aid, not an anonymization, compliance, or a safety guarantee," and readily makes mistakes. OpenAI has acknowledged that sensitive details can still reach reviewers.

232. OpenAI knew the filter failed. Its own instruction guide directs reviewers to escalate tasks they encounter that contain personal information—an internal acknowledgment that personal information reaches reviewers' screens. And the reviewer's screen may separately display a summary of the consumer's prior interactions with ChatGPT, which can indicate what the consumer has previously used the service for and, in some cases, where in the world the consumer lives.

233. A business that knows its redaction tool is, by its own description, an aid rather than a guarantee, and that nonetheless transmits consumers' conversational content and personal information to hundreds of outside personnel, without effectively encrypting or effectively redacting that information before transmission and without limiting what is displayed to what the task requires, has not implemented or maintained security procedures and practices that are reasonable or appropriate to the nature of that information.

234. Plaintiffs' and the members of the Classes' personal information was neither encrypted nor redacted when it was accessed and disclosed. By OpenAI's own account, its filtering model does not reliably remove names or other identifiers, and OpenAI has acknowledged that sensitive details reach reviewers notwithstanding it. The information was displayed to reviewers in plain, readable form.

235. OpenAI's violation of its duty to implement and maintain reasonable security procedures and practices caused the unauthorized access, use, and disclosure of Plaintiffs' and members of the Classes' personal information. Had OpenAI encrypted or effectively redacted that information before transmitting conversations for review, or limited what was displayed to reviewers

to what the evaluation task required, Plaintiffs' personal information would not have been displayed to and read by strangers employed by outside companies.

236. The unauthorized access and disclosure alleged here is not curable. Section 1798.150(b) provides that the implementation and maintenance of reasonable security procedures and practices following an unauthorized access and disclosure does not constitute a cure with respect to that access and disclosure. The conversations reviewers read have been read, and the summaries, scores, and written rationales reviewers derived from them have been created and retained by OpenAI. No prospective change to OpenAI's security practices restores the confidentiality of what was already displayed.

237. Plaintiffs and the members of the Classes suffered damages as a direct and proximate result, including the loss of privacy attendant to the disclosure of their personal information to unrelated individuals, the diminution in value of a service that does not possess the privacy characteristics OpenAI represented, and the loss of the value of the personal information extracted from their communications.

238. Prior to filing this Complaint, Plaintiffs sent notice by certified mail, return receipt requested, to OpenAI at its principal place of business pursuant to California Civil Code § 1798.150(b).

239. Plaintiffs seek, on behalf of themselves and the members of the Classes, public injunctive relief as described above, damages, injunctive relief, declaratory relief, and attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
### UNJUST ENRICHMENT / QUASI-CONTRACT
**(*On behalf of Plaintiffs & the Nationwide Class or the California Subclass*)**

240. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

241. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Defendant. Alternatively, Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendant.

242. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members

through its unauthorized sharing of their private conversations, which OpenAI used as the raw input for human evaluation work of substantial commercial value, and the subscription fees paid by Subscriber Subclass members.

243. Plaintiffs and Class members conferred benefit upon Defendant by providing this valuable information.

244. Such information commands exceptional value because it is used to evaluate, align, and improve generative-AI models.

245. Defendant received and retained this benefit without adequate authorization or consent.

246. Defendant has been unjustly enriched through several mechanisms:

a. **Data Monetization:** Defendant derives commercial value from sharing private conversations for human training;

b. **Cost Avoidance:** Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable data;

c. **Competitive Advantage:** Defendant gained unfair competitive advantages by leveraging these private conversations to optimize its models and platform without bearing the costs associated with compliant data collection.

d. **Enhanced Platform Value:** The unauthorized sharing of private conversations for human review and annotation increases the overall value and effectiveness of Defendant's platform.

247. Defendant obtained these benefits through the Challenged Omission, and by means that were unfair, deceptive, and unlawful.

248. Whereas Plaintiffs and Class members provided this valuable information with a reasonable expectation of privacy and compliance, Defendant actively concealed its data collection and sharing practices from users who were unaware their sensitive information was being used and monetized in this manner.

249. Defendant's retention of these benefits violates fundamental principles of fairness

and equity, as Defendant has profited from the unauthorized exploitation of sensitive and valuable personal information without providing any compensation or benefit to the individuals whose privacy was violated.

250. Plaintiffs and Class members have no adequate remedy at law for Defendant's Unjust Enrichment, as they cannot recover the specific value of their appropriated data through traditional damages calculations.

251. As a direct and proximate result of Defendant's Unjust Enrichment, Plaintiffs and Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their protected information.

252. Plaintiffs and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant and in favor of Plaintiffs and the Classes, and grant the following relief:

a. For an order certifying the Classes and naming Plaintiffs as the representatives of the putative Classes and Plaintiffs' attorneys as Class Counsel to represent the putative Class members;

b. For an order declaring that the Defendant's conduct violates the statutes and laws referenced herein;

c. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d. For actual, compensatory, nominal, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order requiring OpenAI to identify and delete all reviewer work product derived from Class members' Content, including summaries, highlighted passages, scores, and written rationales, and to disgorge the benefits it obtained from that work product, including by deleting or retraining any reward model, preference model, model checkpoint, or model version developed using annotations, ratings, or rationales derived from Class members' conversations;

g. For injunctive relief, including public injunctive relief, restitution, and disgorgement, as pleaded or as the Court may deem proper; and

h. For an order awarding Plaintiffs and the putative Classes their reasonable attorneys' fees and expenses and cost of suit.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted,

Dated: September 16, 2026

By: *<u>/s/ Victor J. Sandoval</u>*

Victor J. Sandoval, SBN 344461
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
t: (562) 534-5907
victor@almeidalawgroup.com

*Counsel for Plaintiffs & the Proposed Classes*

**Affidavit Pursuant to Civil Code Section 1780(d)**

I, VICTOR J. SANDOVAL, declare as follows:

1. I am an attorney duly licensed to practice before all of the courts of the State of California. I am counsel of record for Plaintiffs in this action. I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

2. This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act.

3. Defendant OpenAI OpCo, LLC maintains its principal place of business in San Francisco, California, which is within this District and Division.

4. Defendant has done, and is doing, business in California, including in this District. Such business includes the marketing, promotion, offering, and sale of ChatGPT and ChatGPT subscriptions to consumers within the State of California, and the collection, use, and disclosure of those consumers' conversations.

5. Plaintiff Paul Coutu resides in San Francisco, California, and used ChatGPT in this District.

6. Venue is therefore proper in this District and Division under Cal. Civ. Code § 1780(d).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed September 16, 2026 at Los Angeles, California.

*/s/Victor J. Sandoval*

**ALMEIDA LAW GROUP LLC**
Victor J. Sandoval (SBN 344461)
3415 S. Sepulveda Blvd. Ste 1121
Los Angeles, CA 90034
t: (562) 534-5907

victor@almeidalawgroup.com